## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCALS 302 AND 612 CONSTRUCTION INDUSTRY HEALTH AND SECURITY FUND, on behalf of itself and all others similarly situated,<br><br>     *Plaintiff*,<br><br>    v.<br><br>AUROBINDO PHARMA USA, INC., CITRON PHARMA, LLC, HERITAGE PHARMACEUTICALS, INC., TEVA PHARMACEUTICALS USA, INC., JEFFREY A. GLAZER, and JASON T. MALEK,<br><br>     *Defendants*. | No. _____<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

1.      Plaintiff International Union of Operating Engineers, Locals 302 and 612 Construction Industry Health and Security Fund, on behalf of itself and all others similarly situated, brings this class action for claims under federal and state antitrust laws to recover damages and obtain injunctive and equitable relief for the substantial injuries it and others similarly situated have sustained against Defendants arising from their conspiracy to raise the prices of and allocate markets and customers for generic glyburide tablets ("glyburide") in the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

2.      Glyburide is a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type 2 diabetes. This drug is not new: branded versions of

glyburide have been on the market for over 30 years, and generic versions have been available since the mid-1990s.

3.    In the pharmaceutical industry, the entry of generic versions of branded drugs usually results in aggressive price competition, which in turn reduces prices for drug wholesalers, retail pharmacies, consumers, and third party payors. Defendants here, however, conspired to thwart the economic benefits of generic competition by agreeing to fix and raise prices and rig bids for, and allocate customers of, generic glyburide. Specifically, Defendants agreed to increase glyburide prices by ***200%***.

4.    Defendants orchestrated their conspiracy through secret communications and meetings, both in private and at public events, such as trade association meetings held by the Generic Pharmaceutical Association ("GPhA"), National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing ("ECRM"), among others. Oligopolistic conditions—*e.g.*, few competitors in the market for generic glyburide—further facilitated Defendants' anticompetitive actions and have allowed them to sustain their unlawful, supracompetitive pricing through at least December 2015.

5.    Defendants here were not alone in subverting the operation of a competitive marketplace for generic pharmaceuticals. Defendants' anticompetitive conduct in the glyburide market is part of a series of conspiracies involving at least a dozen generic drug manufacturers and as many as two-dozen generic drugs. Indeed, as noted by the Connecticut Attorney General

George Jepsen, "The issues we're investigating go **way beyond** [glyburide and the companies that make it]. ***Way beyond…We're learning new things every day***."[1]

6.      Defendants' and other generic manufacturers' conduct has grabbed the attention of government enforcers, members of Congress, the press, and drug purchasers. The Department of Justice's Antitrust Division ("DOJ") and the Connecticut Attorney General's Office ("CTAG")—which is leading a multi-state working group of state attorneys general—are conducting sweeping antitrust probes into allegations that generic drug manufacturers participated in conspiracies to fix prices and rig bids for, and allocate customers of, various generic drugs.

7.      Indeed, on December 12 and 13, 2016, DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals: Jeffrey Glazer and Jason Malek.[2] DOJ alleged that both Glazer and Malek conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline sold in the United States. Each was charged with two felony counts under the Sherman Act (15 U.S.C. §1). On January 9, 2017, Glazer pleaded guilty to the charges; Malek similarly pleaded guilty the following day.

8.      On December 14, 2016, 20 state attorneys general also sued Defendants Aurobindo, Citron, Heritage, and Teva, as well as Mayne Pharma and Mylan, for bid-rigging, price-fixing and customer allocation in connection with their sale of glyburide and doxycycline in the United States.[3]

---

[1] Liz Szabo, et al., How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices, The Daily Beast (Dec. 21, 2016), http://thebea.st/2haV9xg.

[2] *United States v. Glazer*, No. 16-cr-506 (E.D. Pa. Dec. 12, 2016); *United States v. Malek*, No. 16-cr-508 (E.D. Pa., Dec. 13, 2016).

[3] *Connecticut v. Aurobindo Pharma USA, Inc*., 16-cv-02056 (D. Conn., filed Dec. 14, 2016).

9.      The DOJ and AG filings stem from long-running investigations and the issuance, by a federal grand jury proceeding in the Eastern District of Pennsylvania, of subpoenas relating to price fixing in the generic drug industry.

10.      In addition to DOJ's and CTAG's investigations, members of Congress have written letters to generic manufacturers Actavis, Apotex, Impax, Lannett, Mylan, Par, Sun, Teva, West-Ward, and Zydus, requesting information concerning their sales of numerous generic drugs, including albuterol sulfate, glycopyrrolate, neostigmine methylsulfate, and benazepril/hydrochlorothiazide.

11.      The ongoing civil and criminal investigations could also result in the imposition of substantial fines against many generic drug manufacturers, including those named as Defendants here. One analyst has estimated, for example, that Defendant Teva could face liability of between $300 million and $700 million, while Mylan could face liability of between $380 million and $770 million. Another analyst estimated that fines industry-wide could exceed $1 billion.[4]

12.      As a result of Defendants' scheme to rig bids, fix and maintain prices for, and allocate customers of, glyburide, consumers and third-party payors paid, and continue to pay, supracompetitive prices for these generic drugs.

13.      Plaintiff seeks to certify two classes. The first class (the "Injunctive Class") is composed of all individuals and entities in the United States or its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for glyburide, other than for resale, for consumption by themselves, their families, or their members,

---

[4] Eric Saonowsky, *DOJ's price-fixing investigation could lead to sizable liabilities, analyst says*, FiercePharma (Nov. 10, 2016), http://www.fiercepharma.com/pharma/doj-s-price-fixing-investigation-could-lead-to-sizable-liabilities-analyst-says.

employees, insureds, participants, or beneficiaries, from at least as early as April 1, 2014 until at least December 31, 2015.

14.     The second class (the "Damages Class") is composed of all individuals and entities who, in Alabama, Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia, indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for glyburide, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as April 1, 2014 through at least December 31, 2015.

## JURISDICTION AND VENUE

15.     Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief and costs of suit, including attorneys' fees, against Defendants for the injuries that Plaintiff and the other members of the Injunctive Class have suffered from Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 16 of the Clayton Act, 15 U.S.C. § 26, because this action arises under the federal antitrust laws. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000 and at least one member of the Damages Class is a citizen of a state different from that of one of Defendants.

18.    Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d) and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

19.    Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

20.    Defendants sold and shipped glyburide in a continuous and uninterrupted flow of interstate commerce. The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate and intrastate commerce.

21.    Each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

## THE PARTIES

### A.    Plaintiff

22.    Formed as a joint health and welfare trust in 1957 for the International Union of Operating Engineers, Locals 302 and 612, Plaintiff International Union of Operating Engineers, Locals 302 and 612 Construction Industry Health and Security Fund ("**IUOE Locals 302/612**") is an employee welfare benefits fund. IUOE Locals 302/612 provides members with health and welfare benefits in at least the following states: Arizona, California, Florida, Hawaii, Iowa, Kansas, Minnesota, Mississippi, North Carolina, North Dakota, Nebraska, Nevada, Oregon, South Dakota, Utah, and Wisconsin. During the Class Period, IUOE Locals 302/612 purchased and paid for some or all the purchase price for glyburide, thereby suffering injury to its business and property. IUOE Locals 302/612 paid and reimbursed more for these products than it would

have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices

and allocate markets and customers.

**B.      Defendants**

23.      Defendant Aurobindo Pharma USA, Inc. ("**Aurobindo**") is a corporation

organized and existing under the laws of the State of Delaware with its principal place of

business at 6 Wheeling Road, Dayton, New Jersey. Aurobindo has an ongoing partnership with

Citron Pharma LLC, whereby Aurobindo manufactures generic glyburide, which Citron Pharma

LLC then sells under its trade dress. During the Class Period, Aurobindo conspired with others to

fix and raise the prices of glyburide sold in the United States.

24.      Defendant Citron Pharma, LLC ("**Citron**") is a corporation organized and

existing under the laws of the State of New Jersey with its principal place of business at 2 Tower

Center Boulevard, Suite 1101, East Brunswick, New Jersey. In December 2016, ACETO

Corporation acquired generic products and related assets of Citron for $429 million. During the

Class Period, Citron conspired with others to fix and raise the prices of glyburide sold in the

United States.

25.      Defendant Heritage Pharmaceuticals, Inc. ("**Heritage**") is a corporation organized

and existing under the laws of the State of Delaware with its principal place of business at 12

Christopher Way, Suite 300, Eatontown, New Jersey. During the Class Period, Heritage

conspired with others to fix and raise the prices of glyburide sold in the United States.

26.      Defendant Teva Pharmaceuticals USA, Inc. ("**Teva**") is a Pennsylvania-based

corporation with its principal place of business at 1090 Horsham Road, North Wales,

Pennsylvania 19454. Teva is a subsidiary of Teva Pharmaceutical Industries Limited, an Israeli

company with principal place of business located at 5 Basel Street, Petach Tikva, Israel 49131.

Teva manufactures, markets, and sells various generic pharmaceutical products. During the Class

Period, Teva conspired with others to fix and raise the prices of glyburide sold in the United States.

27.    Defendant Jeffrey A. Glazer ("**Glazer**") is an individual residing in Marlboro, New Jersey, and is an attorney licensed by the New Jersey State Bar (Attorney ID 031701998). Glazer was the Chief Executive Officer and Chairman of Defendant Heritage. During the Class Period, Glazer, in his capacity as CEO of Heritage, conspired with others to fix and raise the prices of glyburide sold in the United States.

28.    Defendant Jason T. Malek ("**Malek**") is an individual residing in Ocean, New Jersey. Malek was Senior Vice President, Commercial Operations, and later President, of Defendant Heritage. During the Class Period, Malek, in his capacity as CEO of Heritage, conspired with others to fix and raise the prices of glyburide sold in the United States.

29.    Defendants Aurobindo, Citron, Heritage, Teva, Glazer, and Malek are referred to collectively as "**Defendants**."

30.    Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

## GENERIC DRUGS REDUCE PRESCRIPTION DRUG COSTS TO PATIENTS AND THIRD-PARTY PAYORS

31.    When generic versions of a branded drug—whether a generic manufactured and sold by an independent generic manufacturer or an "authorized generic," or "branded generic," sold by or pursuant to an agreement with the branded manufacturer—enter the market, they quickly gain substantial market share.

32.    Empirical studies have shown that within a year of generic entry, generics typically will have obtained about 90% of the market, *i.e.*, pharmacists will fill 90 of every 100

prescriptions with a generic. Indeed, according to IMS Health data, generic drugs as a whole have increased the share of total prescriptions steadily since 2004, and as of 2013, account for 86% of all drugs dispensed in the United States.[5]



**Percent share of prescriptions**

Source: IMS Health, National Prescription Audit, Jan 2014

33.   When generic drugs are launched, they are typically priced below the prices of their branded counterparts. Indeed, in a competitive market, each successive generic product that enters the market lowers the prices of all similar generic products because each entry increases competition for sales and market share. A Food and Drug Administration ("FDA") study demonstrates this effect in the following chart:[6]

---

[5] IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: A review of the use of medicines in the United States in 2013 (Apr. 2014), at 51, http://www.plannedparenthoodadvocate.org/2014/IIHI_US_Use_of_Meds_for_2013.pdf.

[6] FDA, Generic Competition and Drug Prices, http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

34.     More recent evidence obtained by the GAO suggests that each subsequent generic entrant drives the price down by 20%.

35.     A Federal Trade Commission study confirmed the FDA's analyses, finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[7]

36.     Thus, generic competition to even a single brand drug can potentially provide billions of dollars in savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs, which reimburse the cost of drug purchases by covered individuals. Indeed, one study found that the use of generic medicines saved the U.S. healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[8]

---

[7] FTC Staff Study, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* http://emmanuelcombe.org/delay.pdf.

[8] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015), http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

37.     These consumer welfare-enhancing attributes of generic drug competition were bolstered by the enactment of the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act." The Hatch-Waxman Act simplifies the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Instead of filing a lengthy and costly New Drug Application ("NDA"), the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA").

38.     If an ANDA applicant shows that the generic drug is bioequivalent to the brand drug, then the ANDA applicant may rely on scientific and other data compiled in the brand drug's NDA, including safety and efficacy data. The ability to rely on the scientific data published in the referenced brand drug's NDA obviates the need for duplicative and expensive experimentation and clinical trials. The FDA must approve an ANDA unless the information submitted in the ANDA is insufficient to meet the requirements under the Hatch-Waxman Act.

39.     In connection with the approval of a generic drug, the FDA will assign a "Therapeutic Equivalence Code" ranging from "AA" to "BX." An "AB" rating signifies that the approved generic product is therapeutically equivalent to its branded counterpart. An AB rating is significant because under state generic drug substitution laws, pharmacists are permitted—and, in many cases, must—substitute the branded product for its cheaper generic counterpart. Moreover, in about 20 states, non-AB rated generic drugs can be substituted for their branded counterparts subject to certain considerations, including informed consent from patient or

physician and whether the switch is appropriate in a pharmacist's professional judgment.[9] This inures to the financial benefit of consumers and third-party payors.

40.     In sum, the streamlined approval process under the Hatch-Waxman Act makes it easier for generic drug manufacturers to bring competing and cheaper generic products to market.

## GLYBURIDE FACTUAL BACKGROUND

41.     Glyburide is an anti-diabetic drug of the sulfonylurea class indicated to treat Type 2 diabetes.[10] Sulfonylureas have been used to control hyperglycemia (high blood sugar levels) in Type 2 diabetes longer than any class of agents except insulins. Glyburide itself is a white crystalline compound, formulated into tablets.

42.     Glyburide was developed in 1966 as part of a cooperative study between Boehringer Mannheim (now part of F. Hoffmann-La Roche) and Hoechst (now part of Sanofi) and has been marketed since the 1980s. Current branded versions of glyburide include: DiaBeta®, which is sold by Sanofi; and Glynase® (micronized glyburide tablets), which is sold by Pharmacia and Upjohn (now part of Pfizer). Other previously-marketed, but now discontinued, versions of glyburide include Micronase®, which was sold by Pharmacia and Upjohn, and Glucovance® (glyburide-metformin hydrochloride), which was sold by Bristol-Myers Squibb.

43.     Generic drug manufacturers that currently manufacture or sell generic versions of non-micronized, non-metformin glyburide include Aurobindo, Citron, Heritage, Teva,

---

9

http://pharmacistsletter.therapeuticresearch.com/pl/ArticleDD.aspx?nidchk=1&cs=&s=PL&pt=2&segment=1186&dd=220901&AspxAutoDetectCookieSupport=1.

10

https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.SearchAction&SearchType=BasicSearch&SearchTerm=GLYBURIDE; http://www.worldlibrary.org/articles/glyburide

CorePharma, LLC (now part of Impax Laboratories, Inc.), TruPharma LLC (in a partnership with PharmaDax Inc.), and Zydus Pharmaceuticals USA Inc.

44.    CorePharma, TruPharma, and Zydus only entered the glyburide market recently: CorePharma received FDA approval for its glyburide product in September 2015; TruPharma's glyburide product received FDA approval in April 2016; and Zydus's glyburide product received FDA approval in May 2016.

45.    Accordingly, during the Class Period, the primary competitors in the non-micronized, non-metformin glyburide market were Defendants Aurobindo, Citron, Heritage, and Teva.

## DEFENDANTS CONSPIRED TO FIX AND RAISE GLYBURIDE PRICES

46.    Defendants entered into a multiyear conspiracy to (1) fix and raise the prices of glyburide, (2) rig bids for glyburide, and (3) allocate customers of glyburide. Heritage, through its two executives, Malek and Glazer, acted as the "ringleaders" who organized and monitored Defendants' conspiracy.

47.    On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of different drugs that Heritage targeted for price increases, including glyburide. On the call, Malek discussed the need to coordinate pricing with Heritage's competitors in the markets for these various generic drugs. At the time of this call, Aurobindo and Teva were Heritage's only competitors in the glyburide market.

48.    After the call, Malek instructed members of the Heritage sales team to reach out to their contacts at Aurobindo and Teva immediately in an attempt to reach agreements on the price increases for glyburide, among other drugs. Different Heritage employees were responsible for communicating with different competitors.

49.     Malek was responsible for communicating with Teva, which competed with Heritage in the markets for several generic drugs, including glyburide. Malek made direct contact with a representative at Teva to discuss price increases for glyburide, among other generic drugs. Ultimately, Malek and Teva's representative reached an agreement to raise prices on glyburide and other generic drugs.

50.     Defendants Malek and Glazer pushed Heritage employees to communicate with their competitors and obtain agreements to raise prices. Malek and Glazer sent several emails to their employees imploring them to reach agreements with their competitors in the generic glyburide market, among others, as soon as possible. For example, on April 28, 2014, Malek sent an email to one Heritage employee concerning the status of discussions with Aurobindo.

51.     Glazer followed up the next day (April 29) with an email to that same employee requesting further information, and Malek sent an additional email on April 30 requesting an update.

52.     On May 9, 2014, Heritage held another teleconference with its employees to discuss the contemplated prices increases for glyburide, among other generic drugs.

53.     The following week, one Heritage employee met in-person and discussed price increase strategies with several competitors at the Minnesota Multistate Contracting Alliance for Pharmacy. During that meeting, that Heritage employee agreed with her counterpart at Aurobindo that they would both raise the prices of their glyburide products. On May 15, 2014, the same Heritage employee emailed Malek confirming this agreement.

54.     On June 23, 2014, Heritage employees met and discussed the specific percentage amounts they would seek to increase certain generic drugs, including glyburide, and the

strategies for doing so. They reached a consensus that glyburide prices would be increased by 200%.

55.     Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors—including Heritage's competitors in the glyburide market—in order to secure agreements to raise prices for glyburide and other generic drugs.

56.     Indeed, Heritage's competitor outreach extended to incoming entrants in the glyburide market to ensure that these new competitors would not engage in renegade price competition. For example, on June 25, 2014, one Heritage employee texted her friend, an employee of Defendant Citron, to discuss whether Citron would be selling glyburide in the near future. Once it was determined that Citron would be entering the glyburide market (through a manufacturing partnership with Aurobindo), Heritage employees had extensive phone, text message, and in-person conversations with Citron employees concerning Citron's glyburide pricing and bidding strategies.

57.     While these discussions with Citron were ongoing, Malek continued to push Heritage's employees to communicate with Heritage's other competitors—both in the glyburide and other generic drug markets—in order to maintain existing agreements on pricing and bidding as well as reach new ones.

58.     Further communications among competitors were conducted through the auspices of trade association meetings and conferences—including those sponsored by NADCS, HDMA, the GPhA and ECRM. Defendants' representatives participated in golf, dinner, and other social outings sponsored by these organizations. During these conferences, Defendants and other generic drug manufacturers also discussed current and future business plans, prices, bids, rebates, and customers. These conferences—as well as their attendant social gatherings—provided

Defendants with the means and opportunity to discuss and reaffirm existing agreements to fix and raise prices for glyburide, among other drugs.

59.     Defendants' employees also attended private "industry dinners," outside the trade association context, with employees from competitors. At these industry dinners, one company was usually responsible for paying for dinner for all of the attendees—with who pays typically determined by alphabetical order.

60.     Female generic pharmaceutical sales representatives also arranged regular "Girls Night Out" ("GNO"), or "Women in the Industry," meetings and dinners. "Women in the Industry" dinners were typically organized by a female salesperson from Heritage who resides in Minnesota. Other meeting participants were typically, but not exclusively, employees of generic drug manufacturers located in Minnesota, or female salespeople residing in the area. During these industry dinners, GNOs, and "Women in the Industry" gatherings, Defendants' representatives met with their competitors and discussed competitively sensitive information, including their respective current and future business plans, prices, bids, rebates, customers.

61.     At least one GNO was held in September 2014, and several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving Citron and Heritage, among others); (2) in Baltimore in May (involving Citron and Heritage among others); and (3) at the NACDS conference in August (involving Citron and Heritage, among others).

62.     Defendants' conspiracy was also aided and abetted by Defendants' efforts to actively conceal their wrongdoing from the public—and even the government regulators investigating their illegal activities. Going back to at least 2012, Heritage executives took overt steps to conceal their illegal activity and destroy evidence of their wrongdoing. Specifically, none of the email accounts maintained by Heritage had any company-imposed document

retention policy associated with them. Indeed, Heritage executives reminded each other to delete emails reflecting incriminating communications.

63.    Notwithstanding the practice of destruction of email evidence—and the lack of an official document retention policy—out of a further abundance of caution, Heritage and other Defendants consciously avoided using emails or other forms of communications that could later be subject to discovery.

64.    For example, shortly after a text message exchange between Citron and Heritage employees, in which the two companies agreed to fix and raise prices for glyburide, one Citron employee told her counterpart at Heritage that Heritage employees should not communicate with Citron through email, but instead should call a designated person a Citron, if they had any information to share.

65.    The end result of Defendants' anticompetitive scheme was a significant reduction in a competition, which resulted in increased prices to Plaintiff and members of the Classes. Through their conspiracy Defendants perverted the operation of a free and open marketplace for generic glyburide. As a result, Plaintiff and members of the Classes have paid supracompetitive prices for glyburide.

## THE GENERIC GLYBURIDE MARKET IS SUSCEPTIBLE TO A PRICE-FIXING CONSPIRACY

### A.    Factors Supporting the Existence of a Conspiracy in the Glyburide Market

66.    The structure and other characteristics of the market for glyburide make it conducive to collusion and price-fixing. Specifically, during the Class Period, the glyburide market exhibited: (1) high barriers to entry; (2) inelasticity of demand; (3) a high degree of commoditization; (4) a high degree of concentration; (5) competitors acting against their economic self-interest; and (6) opportunities to conspire.

### 1. There Are High Barriers to Entry in the Glyburide Market

67.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

68.    The glyburide market has high barriers to entry.

69.    Even though glyburide is not protected by any patents, regulatory hurdles and the costs of doing business make market entry difficult, time consuming, and expensive. Any generic drug manufacturer seeking to enter the glyburide market must file an ANDA and receive FDA approval.

70.    To file an ANDA, the generic manufacturer must show that the generic product is bioequivalent to its branded counterpart and invest considerable resources in the development of production lines capable of making the drug. Historically, the cost of filing an ANDA is about $1 million.[11] A generic manufacturer's production facilities must also meet CGMP standards, which increase the costs of production.

71.    Moreover, a generic manufacturer that cannot produce the Active Pharmaceutical Ingredient ("API") for glyburide must have a reliable and affordable source of API for these products.

72.    Prospective generic manufacturers must also be able to satisfy FDA regulations and guidance governing bioequivalence and bioavailability of their glyburide products. This

---

[11] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), at 7.

requires showing that the proposed generic glyburide products have, among other things, the same therapeutic qualities and absorption profiles as their branded counterparts.

73.    The failure to meet all FDA requirements concerning manufacturing, testing, and labeling of glyburide will result in the FDA delaying (or denying) approval of an ANDA. These delays can last for months or even years.

74.    Even if a non-conspiring generic manufacturer were to see an opportunity to compete on price regarding glyburide, due to the fact that the FDA's review of ANDAs is currently significantly "backlogged," any potential entrant would necessarily be delayed for years.[12] Indeed, the FDA has stated that, as of fiscal year 2015, ANDA approvals can take 40 months or more.[13]

### 2.    Demand for Glyburide Is Inelastic

75.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

76.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

---

[12] *Id.* at 7.

[13] GAO, *Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases*, No. 16-706, at 26 (Aug. 2016), http://www.gao.gov/assets/680/679022.pdf.

77.     Demand for glyburide is highly inelastic because it is a unique product for which there are no reasonable substitutes.

78.     Glyburide is an oral diabetes medication of the sulfonylurea class that is indicated to treat Type 2 Diabetes. The sulfonylureas can be classified as first, second (including glyburide) and possibly third generation agents.[14] The second and third generation sulfonylureas are the newer, "more potent" agents. Even among other second generation sulfonylureas—*e.g.*, glipizide, and glimepiride—glyburide has unique chemistry and pharmacokinetics. Thus, there are no reasonable substitutes for glyburide.

79.     Branded versions of glyburide do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.

80.     Thus, purchasers of glyburide are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 3.     Glyburide Is a Commodity Product

81.     When products are subject to commoditization, producers of those products are usually forced to compete on price, as opposed to other factors, such as quality and ancillary services. When price becomes a significant factor in driving demand for a product, producers of a commoditized product have an easier time colluding on price than other non-price factors because price-based collusion is much easier to implement and monitor.

82.     Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. Indeed, state

---

[14] http://www.auburn.edu/~deruija/endo_diabetesoralagents.pdf.

laws require that pharmacists substitute available AB-rated generic drugs for their branded counterparts precisely because of their lower price. Defendants' glyburide products are AB-rated generics to their branded counterparts, enabling substitution.

83.    Moreover, because generic manufacturers generally spend little effort advertising or detailing their generic compounds (*i.e.*, the practice of providing promotional materials and free samples to physicians), the primary means for one generic manufacturer to differentiate its product from another generic competitor's product is through price reductions.[15] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 4.    The Generic Glyburide Market Is Highly Concentrated

84.    A concentrated market is more susceptible to collusion and other anticompetitive practices.

85.    The glyburide market is highly concentrated, with less than a handful of competitors—Defendants here—controlling the entire market. Only more recently, beginning in September 2015 when CorePharma received FDA approval for its glyburide ANDA, have other generic drug manufacturers entered the glyburide market.

86.    With only four manufacturers in the market during the Class Period, Defendants were easily able to, and in fact did, coordinate pricing and bidding strategies for their respective glyburide products. Moreover, with few competitors in the glyburide market, Defendants could also easily monitor prices in the downstream market and police deviations from agreed-upon prices.

---

[15] *See* Congressional Budget Office, Promotional Spending for Prescription Drugs, Economic & Budget Issues Brief (Dec. 2, 2009), at 1.

### 5.    Defendants' Pricing of Glyburide Was Against Their Self-Interest

87.    Competitive firms in a competitive, commoditized marketplace will typically price their products aggressively, relative to their competitors' products. Firms price aggressively with the understanding that, if they do not do so, other competitors will undercut their relatively high price, taking sales—and ultimately market share—away from the firms that are pricing less aggressively.

88.    Here, however, rather than attempt to take sales, revenue, and market share away from one another, Defendants instead sought to meet the price increases made by others and extract supracompetitive prices from Plaintiff and members of the Classes.

89.    Such conduct was against each Defendant's self-interest because rather than cut prices to gain sales, revenues, and market share, each Defendant instead sought to sacrifice these potential gains in favor of cartel pricing. Defendants' individual failures to cut prices in the face of competitor price increases suggest that Defendants were conspiring to fix and raise prices, rather than competing on price.

### 6.    Defendants Had Numerous Opportunities to Conspire

90.    To sustain a conspiracy, the conspirators must periodically communicate to ensure that all are adhering to the collective scheme. Here, these meetings occurred primarily through (1) trade associations and customer conferences; (2) private meetings, dinners and outings among smaller groups of generic drug manufacturers; and (3) teleconferences, emails, and text messages.

#### (a)    Trade Association Meetings and Customer Conferences

91.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of glyburide, as well as other drugs, and to allocate

markets and customers for glyburide. These trade associations include, but are not limited to, GPhA, NACDS, HDMA, and ECRM. In addition, Defendants and others coordinated their pricing and bidding strategies for various generic drugs during customer-sponsored conferences—in effect, using these meeting arranged and funded by their customers to coordinate the very conspiracy that was designed to cheat them of a free and open competition.

92.    *GPhA*: GPhA is the largest trade association for generic and biosimilar manufacturers. Aurobindo's CEO Robert Cunard and Teva's Debra Barrett serve on GPhA's Board of Directors. Defendants' representatives attended many meetings held by GPhA, including the following between 2014 and 2015:

| Meeting | Meeting Date and Location | Attendees |
|---|---|---|
| 2014 GPhA Annual Meeting | February 19-21, 2014, Orlando, Florida | Aurobindo, Heritage, Teva |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014, Bethesda, Maryland | Aurobindo, Citron, Heritage, Teva |
| 2015 GPhA Annual Meeting | February 9-11, 2015, Miami Beach, Florida | Aurobindo, Heritage, Teva |
| 2015 GPhA CMC Workshop | June 9-10, 2015, Bethesda, Maryland | Citron, Heritage, Teva |
| 2015 GPhA Fall Technical Conference | November 2-4, 2015, Bethesda, Maryland | Aurobindo, Citron, Heritage, Teva |

93.    *NACDS*: NACDS is a national trade association representing chain community pharmacies. Its members include drug manufacturers, drug wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences,

that Defendants and other generic manufacturers attended. For example, Defendants Citron and Heritage attended a NACDS conference in August 2015.

94.    **HDMA**: HDMA is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics. HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.

95.    HDMA members include Defendants Citron, Heritage, and Teva, as well as certain of their employees.

96.    **ECRM**: ECRM is a broad-based trade association that includes not only stakeholders from the medical and pharmaceutical industry but other industries as well. ECRM's primary mission is "to strengthen the business practices of our clients by offering Efficient Program Planning Sessions (EPPS) that are supported by innovative technology solutions." Within ECRM, however, there are discrete program and conferences dedicated solely to distribution and sales of generic pharmaceutical products. For example, each year, ECRM holds a "Retail Pharmacy Generic Pharmaceuticals Efficient Program Planning Session." Attendees have included representatives from Defendants Citron and Heritage.

97.    **Customer Conferences:** Many customers of Defendants, including group purchasing organizations such as the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), also hold multi-day conferences throughout the year which many, if not most, of the generic manufacturers across the United States are invited to attend. The week following Heritage's May 9, 2014, teleconference to discuss contemplated price increases for glyburide, a number of glyburide competitors met in person and discussed price increase strategies at the

MMCAP conference. During that meeting, Heritage and Aurobindo confirmed their agreement to raise the price of glyburide.

98.    As uncovered in the state attorneys' general investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers. These discussions occurred at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows. Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

### (b)    Private Meetings, Dinners, and Outings

99.    In addition to these conferences and trade shows, sales representatives had separate and smaller face-to-face meetings with their competitors to discuss their business. Further, all of the defendants are located in or near New Jersey, giving them easier and more frequent opportunities to meet and collude.

100.    As uncovered by the state attorneys' general investigation, high-level executives of many generic drug manufacturers, including Defendants here, periodically attended "industry dinners." For instance, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least 13 high ranking male executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey. An executive from Defendant Aurobindo attended this particular dinner.

101.    Female generic pharmaceutical sales representatives also get together regularly for what they refer to as a GNO, or alternatively "Women in the Industry" meetings and dinners. During these GNOs, meetings and dinners, these representatives meet with their competitors and

discuss competitively sensitive information. Several different GNOs were held in 2015,

including: (1) at the ECRM conference in February; (2) in Baltimore, Maryland in May, and (3)

at the NACDS conference in August.

## GOVERNMENT INVESTIGATIONS INTO GENERIC DRUG PRICING

A.    **DOJ and State Attorneys General File Their First Complaints Alleging that Generic Drug Manufacturers Conspired to Fix Prices, Rig Bids, and Allocate Customers and Markets**

102.    On December 12 and 13, 2016, DOJ filed its first charges in connection with their

two-year investigation into collusion in the generic pharmaceuticals industry. DOJ charged

former Heritage Pharmaceutical executives Glazer and Malek each with two felony counts under

the Sherman Act for conspiring with others to fix prices, rig bids, and allocate customers for the

generic drugs glyburide and doxycycline. According to reports, Glazer and Malek are

cooperating with DOJ's continued investigation.[16]

103.    DOJ alleged that Glazer and Malek conspired with others to fix prices and rig bids

for, and allocate customers of, glyburide at least as early as April 2014 and continuing through at

least December 2015. DOJ also alleged that Glazer and Malek conspired with others to fix prices

and rig bids for, and allocate customers of, doxycycline at least as early as April 2013 and

continuing through at least December 2015. On January 9, 2017, Glazer pleaded guilty to the

charges; Malek similarly pleaded guilty the following day.

104.    On December 14, 2016, 20 state attorneys general sued generic drug

manufacturers Aurobindo, Citron, Heritage, Mayne Pharma, Mylan, and Teva for their scheme to

rig bids and fix and maintain prices, and allocate customers, for glyburide and doxycycline.

According to their complaint, the state attorneys general have uncovered collusive conduct

---

[16] Tom Schoenberg, David McLaughlin, and Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), http://bloom.bg/2hNRrpb.

involving "numerous different drugs and competitors, which will be acted upon at the appropriate time."[17]

105.    The state attorneys general allege that Heritage Pharmaceuticals acted as a "ringleader" conspiring with other companies on a wide range of drugs. These conspiracies were orchestrated and maintained through frequent meetings and communications between each conspirator's sales executives. As alleged above, the conspirators met at trade shows, conferences, and outings sponsored by numerous trade associations. In addition to these public events, the state attorneys general alleged that the conspiring generic manufacturers held private industry dinners and outings, including GNOs, as alleged above.

### B.    Ongoing Federal and State Antitrust Investigations into Generic Drug Pricing

106.    The complaints filed by DOJ and state attorneys general are just the beginning, and their respective investigations continue. Several generic drug manufacturers, including Defendants Citron and Teva, have received subpoenas or requests for information concerning their pricing of generic drugs, as well as their communications with their competitors for those drugs.

107.    Recent news reports have confirmed the sweeping nature of the DOJ investigation: at least two-dozen drugs and a dozen drug companies are under criminal investigation.

108.    A federal grand jury investigating the matter is empaneled in the Eastern District of Pennsylvania. The result of these investigations could result in the imposition of substantial

---

[17] Compl. at ¶ 9, *Connecticut v. Aurobindo Pharma USA, Inc.*, 16-cv-02056 (D. Conn., filed Dec. 14, 2016).

fines and criminal pleas for generic manufacturers, and jail time for company executives. Some analysts have estimated that DOJ could impose fines in excess of $1 billion.[18]

109.    To date, the following generic drug companies have been contacted in connection with both federal and state antitrust probes:

110.    *Citron.* On December 21, 2016, ACETO Corporation, a company which recently purchased Citron's generic assets in December 2016, disclosed that the "Antitrust Division of the U.S. Department of Justice executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ."[19] ACETO also disclosed that in September 2016, the CTAG requested that Citron produce all documents produced to DOJ.

111.    *Teva.* On August 4, 2016, Teva disclosed that "[o]n June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[20] In that same filing, Teva disclosed that on July 12, 2016, "Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."[21]

---

[18] Eric Saonowsky, *DOJ's price-fixing investigation could lead to sizable liabilities, analyst says*, FiercePharma (Nov. 10, 2016), http://www.fiercepharma.com/pharma/doj-s-price-fixing-investigation-could-lead-to-sizable-liabilities-analyst-says.

[19] Aceto Corp., SEC Form 8-K, Ex. 99.5.

[20] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMDcyODU1JkRTVVE9MCZTRVE9MCZTUURFU0M0M9U0VDElPTl9FTlRJUkUmUmc3Vic2lkPTU3.

[21] *Id.*

112. **Actavis.** Actavis's parent Allergan plc also disclosed in public filings that they received subpoenas from DOJ. Allergan reported that, on June 25, 2015, Actavis received a subpoena from DOJ "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[22]

113. **Taro.** On September 9, 2016, Defendant Taro disclosed that on September 8, 2016, it and two senior officers in Taro's commercial team, "received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[23]

114. **Lannett.** In July 2014, Lannett revealed in SEC filings that they had received subpoenas from the CTAG in connection with its investigation into whether "anyone engaged in a contract, combination or conspiracy in restraint of trade or commerce which has the effect of (i) fixing, maintaining or controlling prices of digoxin or (ii) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law."[24]

115. The information and documents sought by the CTAG included: (1) the identification of "all persons at Lannett with any supervisory, executive or other significant non-ministerial responsibility related to the pricing or sale of Digoxin"; (2) the identification and production of "all documents or communications referring or relating to any decision(s), by you

---

[22] Allergan, SEC 2015 Form 10-K, at F-106.

[23] Taro, SEC Form 6-K (Sept. 9, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMTM0MjUwJiU wJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

[24] Impax Laboratories (IPXL) Receives Subpoena from Connecticut AG, http://www.streetinsider.com/Corporate+News/Impax+Laboratories+(IPXL)+Receives+Subpoena+from+Connecticut+AG/9662945.html; Lannett Receive Inquiry from Connecticut Attorney General, http://finance.yahoo.com/news/lannett-receives-inquiry-connecticut-attorney-153300612.html.

or any other company, to increase the price of Digoxin"; (3) the production of "[a]ll marketing plans, strategic plans or any other documents relating to the development, manufacture and commercialization of Digoxin"; and (4) the identification and production of "written compliance policy directed to the antitrust laws."

116.    Five months later, on November 10, 2014, Lannett disclosed in an SEC filing that a senior sales and marketing executive was served with a DOJ grand jury subpoena "relating to a federal investigation of the generic industry into possible violations of anti-trust laws."[25]

117.    On December 5, 2014, Lannett disclosed in a Form 8-K that it received another "grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[26] Lannett further disclosed that the "subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products."[27] In a 2015 SEC filing, Lannett further disclosed that the federal subpoenas requested information and documents for the period 2005 through the dates the subpoenas were issued.

118.    **Impax.** In July 2014, Impax disclosed in received a subpoena from the CTAG concerning Impax's sales of generic digoxin and whether it agreed with others to fix prices or allocate customers or territories. In November 2014, Impax disclosed that it also received a federal grand jury subpoena requesting testimony and documents about "any communication or

---

[25] Ed Silverman, *Justice Department Probes Generic Companies After Price Hike Reports*, Wall. St. J. (Nov. 10, 2014).

[26] Lannett Form 8-K (Dec. 5, 2014), http://www.sec.gov/Archives/edgar/data/57725/000110465914085406/a14-25827_18k.htm.

[27] *Id.*

correspondence with any competitor about the sale of generic drugs."[28] The scope of the subpoenas was not limited to a particular drug or a particular timeframe.

119.    Later, Impax further disclosed that on March 13, 2015, "the Company received a grand jury subpoena from the Justice Department requesting the production of information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular the Justice Department's investigation currently focuses on four generic medications: digoxin, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[29]

120.    *Par.* In an SEC Form 10-K for 2014, Par disclosed that it had received a subpoena from DOJ "requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin® (digoxin) oral tablets and our generic doxycycline products."[30] Moreover, in that same filing Par revealed that the CTAG served a subpoena on Par on August 6, 2014 "requesting documents related to our agreement with Covis Pharma S.a.r.l. to distribute an authorized generic version of Covis's Lanoxin® (digoxin) oral tablets."[31] Par stated that it completed its response on October 28, 2014.

121.    *Mylan.* Mylan similarly disclosed in a 2016 SEC filing that it received a subpoena from DOJ "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products."[32] Mylan received a similar subpoena from the CTAG, seeking "information relating to the marketing,

---

[28] Impax SEC Form 8-K (Nov. 6, 2014), https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[29] Impax, SEC 2015 Form 10-K, at F-53.

[30] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K, at 37.

[31] *Id.*

[32] Mylan, SEC 2015 Form 10-K, at 160.

pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[33]

122.    More recently, on November 10, 2016, Mylan disclosed that DOJ issued a subpoena to Mylan and certain employees and senior management "seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products."[34] Significantly, Mylan disclosed that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[35]

123.    **Sun.** On or about May 28, 2016, Sun disclosed that it had received a subpoena from DOJ "seeking information about the pricing and marketing of the generic drugs it sells in the United States."[36] DOJ also sought documents related to "employee and corporate records and communications with competitors."[37]

124.    **Dr. Reddy's**. On or about August 11, 2016, Dr. Reddy's disclosed in an SEC filing that it had received a subpoena from DOJ on July 6, 2016, "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[38] In that same filing, Dr. Reddy's disclosed that it had received a subpoena from the CTAG concerning the same matters.

---

[33] *Id.*

[34] Mylan SEC Form 10-Q, at 58 (Nov. 10, 2016), http://apps.shareholder.com/sec/viewerContent.aspx?companyid=ABEA-2LQZGT&docid=11678486#MYL10Q_20160930XDOC_HTM_S582E80BDD4215D11A4040D12D4C2E297.

[35] *Id.*

[36] India's Sun Pharma Gets U.S. Subpoena Over Generic Drugs Pricing, Fortune (May 28, 2016), http://fortune.com/2016/05/28/sun-pharma-drug-price-subpoena.

[37] *Id*.

[38] Dr. Reddy's, SEC Form 6-K (Aug. 31, 2016).

125.   *Mayne Pharma.* In its 2016 Annual Report, Mayne Pharma Ltd. disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena form the Antitrust Division of the US Department of Justice [] in the last two years seeking information relating to marketing, pricing and sales of select generic drugs."[39] In the same Annual Report, Mayne Pharma also disclosed that it had received a subpoena from the CTAG seeking similar information.

126.   *Sandoz.* On March 24, 2016, Sandoz received a subpoena from DOJ requesting documents related to the market and pricing of generic drugs, as well as communications with competitors since 2012.[40]

127.   *Zydus.* Although Zydus is not publicly traded in the United States and thus not subject to reporting requirements under federal securities laws, recent press reports have stated the Zydus is also a target of DOJ's sweeping investigation.[41] According to one article, Zydus is being investigated in connection with its marketing and sale of divalproex ER.[42]

C.    **Congressional Investigations into Generic Drug Pricing**

128.   As news reports have proliferated with respect to the dramatic rise in price of certain generic drugs, members of Congress have expressed a growing concern as to what is driving these price hikes. On October 2, 2014, Representative Elijah E. Cummings, the Ranking Member of the House Committee on Oversight and Government Reform, and Senator Bernard Sanders, Chairman of the Subcommittee on Primary Health and Aging, Senate Committee on

---

[39] Mayne Pharma, 2016 Annual Report, at 75.

[40] James Paton & Yaacov Benmeleh, *Novartis Says Generics Unit Received Subpoena in March in U.S.*, Bloomberg Law (Nov. 9, 2016).

[41] Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India, http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms.

[42] *Hillary win may pose pricing challenges for pharma cos: Report*, F. World (Nov. 7, 2016), http://www.firstpost.com/world/hillary-win-may-pose-pricing-challenges-for-pharma-cos-report-3093544.html.

Health, Education, Labor and Pensions, "sent letters to 14 drug manufacturers requesting information about the escalating prices of generic drugs used to treat everything from common medical conditions to life-threatening illnesses."[43]

129.    These letters were delivered to the heads of Actavis, Apotex, Dr. Reddy's, Impax, Mylan, Lannett, Par, Teva, Zydus, Endo, Heritage, and Marathon Pharmaceuticals, seeking information about the pricing of divalproex ER, pravastatin, digoxin, doxycycline, albuterol sulfate, glycopyrrolate, neostigmine methylsulfate, benazepril/ hydrochlorothiazide, Isuprel® (isoproterenol hydrochloride), and Nitropress® (nitroprusside).

130.    Each letter stated:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community of Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients['] and pharmacies['] ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients."[44]

131.    In addition to sending letters to the generic drug manufacturers listed above, Senator Sanders and Representative Cummings wrote a joint letter to Sylvia Burwell, the

---

[43] Ranking Members Cummings and Chairman Sanders Investigate Staggering Price Increases for Generic Drugs, http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

[44] *See, e.g.*, Ltr. from Sen. Bernard Sanders & Rep. Elijah E. Cummings to Arthur P. Bedrosian (Oct. 2, 2014), http://www.sanders.senate.gov/download/letter-to-mr-bedrosian-president-and-ceo-lannett-company-inc?inline=file (citing Letter from B. Douglas Hoey to Sen. Tom Harkin, et al. (Jan. 8, 2014), https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf)).

Department of Health and Human Services Secretary, stating, "The federal government must act immediately and aggressively to address the increasing costs of these drugs."[45]

132.    The Senate Subcommittee on Primary Health and Aging held a hearing on November 20, 2014. Although the Presidents and CEOs of Lannett, Teva, and Marathon Pharmaceuticals were scheduled to attend the hearing, none appeared. Many panelists agreed that reduced competition across various generic drugs has contributed to the price hikes observed in the overall market.

133.    Subsequent congressional hearings concerning the dramatic rise of generic drug prices were held in December 2015 and February 2016. At the U.S. Senate Special Committee on Aging's December 9, 2015 hearing, Erin D. Fox, PharmD Director of the Drug Information Service of the University of Utah, noted the deleterious effect these drug prices have had on patient access and healthcare, stating, "When medication prices increase in an unpredictable and dramatic way, this can create an access issue for hospitals and patients. If hospitals cannot afford to stock a product in the same amount due to price increases, this effectively creates a shortage."[46]

134.    On February 24, 2015, Senator Sanders and Representative Cummings wrote to Daniel R. Levinson, the Inspector General of the Department of Health and Human Services, imploring the department to "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare

---

[45] Congressional Panel to Probe Generic Drug Price Hikes (Nov. 11, 2014), http://www.sanders.senate.gov/newsroom/press-releases/congressional-panel-to-probe-generic-drug-price-hikes.

[46] Statement of Erin R. Fox, PharmD Director, Drug Information Service, Hearing on "Sudden Price Spikes in Off-Patent Drugs: Perspectives from the Front Lines" (Dec. 9, 2015), at 7, http://www.aging.senate.gov/imo/media/doc/SCA_Fox_12_9_15.pdf.

and Medicaid programs."[47] On April 13, 2015, Inspector General Levinson responded to Senator

Sanders and Representative Cummings's letter, stating that his office planned "to update our

previous review of generic drug price increases under the Medicaid drug rebate program."[48]

## ANTITRUST IMPACT

135.    During the relevant period, Plaintiff and members of the Classes purchased

substantial amounts of glyburide indirectly from Defendants. As a result of Defendants' illegal

conduct, these purchasers have paid, and continue to pay, artificially inflated prices for

glyburide. The prices paid were substantially higher than the prices that Plaintiff and members of

the Classes would have paid absent the illegal conduct alleged in this Complaint.

136.    As a consequence, purchasers of glyburide have sustained substantial losses and

damage to their business and property in the form of overcharges—and their losses continue to

date. The full amounts, forms, and components of such damages will be calculated after

discovery and upon proof at trial.

137.    Defendants' efforts to restrain competition in the market for glyburide have

substantially affected intrastate and interstate commerce—and continue to do so.

138.    At all material times, Defendants manufactured, promoted, distributed, and sold

substantial amounts of glyburide in a continuous and uninterrupted flow of commerce throughout

the United States. Defendants' anticompetitive conduct had substantial intrastate effects in every

state of purchase because, among other things, consumers and third-party payors within each

state were forced to pay supracompetitive prices for glyburide.

---

[47] Letter from Hon. Bernard Sanders and Elijah Cummings to Hon. Daniel Levinson (Feb. 24, 2015), http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[48] Letter from Hon. Daniel Levinson to Hon. Bernard Sanders (Apr. 13, 2015), http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

139.    At all times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of glyburide.

140.    Economists recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top.[49] He also says that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[50]

141.    The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of glyburide to Plaintiff and members of the Classes.

142.    Defendants' anticompetitive conduct enabled Defendants to charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent Defendants' unlawful actions.

143.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

144.    The inflated prices that Plaintiff and members of the Classes have paid for glyburide, and continue to pay, are traceable to and the foreseeable result of, the overcharges by Defendants.

---

[49] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).

[50] *Id.*

## CLASS ALLEGATIONS

145.    Plaintiff brings this action as a class action, under Fed. R. Civ. P. 23(a) and (b)(2),

on behalf of itself and a nationwide class of similarly situated individuals seeking injunctive and

equitable relief:

> **The Injunctive Class**:
>
> All persons or entities in the United States and its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for glyburide, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as April 1, 2014 through at least December 31, 2015.

146.    Plaintiff also brings this action as a class action, under Fed. R. Civ. P. 23(a) and

(b)(3), on behalf of itself and a class of similarly situated individuals seeking damages arising

from Defendants' conduct as described below:

> **The Damages Class**:
>
> All persons or entities who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for glyburide, other than for resale, for consumption by by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as April 1, 2014 through at least December 31, 2015, in any of the following states, commonwealths, and territories: Alabama, Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia.

147.    The following persons and entities are excluded from the above-described

Classes:

> (a)    Defendants and their counsel, officers, directors, management, employees,

subsidiaries, or affiliates;

(b)      All governmental entities, except for government-funded employee benefit plans;

(c)      All persons or entities who purchased glyburide for purposes of resale or directly from Defendants or their affiliates;

(d)      Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

(e)      Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs); and

(f)      The judges in this case and any members of their immediate families.

148.      Members of the Classes are so numerous that joinder is impracticable. Plaintiff believes that there are thousands of members of each Class.

149.      Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes were damaged by the same wrongful conduct by Defendants in that they paid artificially inflated prices for glyburide as a result of Defendants' wrongful conduct— and continue to do so.

150.      Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes.

151.      Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with experience in class action antitrust litigation involving pharmaceutical products.

152.      Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have

acted on grounds generally applicable to each member of the Injunctive Class and Damages Class.

153.    Questions of law and fact common to members of both Classes include:

(a)    the identity of the participants in the conspiracy;

(b)    whether Defendants conspired to fix, raise, maintain, and stabilize the prices of glyburide;

(c)    whether Defendants conspired to allocate markets or customers with respect to glyburide;

(d)    whether Defendants' conduct harmed competition in the glyburide market;

(e)    whether Defendants' activities alleged herein have substantially affected interstate and intrastate commerce;

(f)    whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Plaintiff and members of the Classes in the nature of overcharges;

(g)    the amount of overcharges paid by Plaintiff and members of the Classes in the aggregate; and

(h)    the injunctive and other equitable relief needed to end Defendants' restraint and to restore competition in the glyburide market.

154.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining

redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

155.    Plaintiff knows of no special difficulty to be encountered in this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of Sherman Act § 1, 15 U.S.C. § 1
### (By Plaintiff and Injunctive Class Members Against All Defendants)

156.    Plaintiff incorporates the preceding paragraphs by reference.

157.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme to fix, raise, maintain, and stabilize the prices of glyburide, and allocate markets and customers for glyburide.

158.    Had Defendants competed instead of conspiring to restrain trade, Plaintiff and Injunctive Class Members would have paid substantially lower prices for glyburide.

159.    Defendants intended, and accomplished, a price-fixing conspiracy and horizontal market allocation of the market for glyburide, which are *per se* violations of Section 1 of the Sherman Act. By their agreement, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiff and Injunctive Class Members paid artificially inflated prices for glyburide.

160.    Plaintiff and Injunctive Class Members have suffered harm, and are continuing to suffer harm, as a result of paying higher prices for glyburide than they would have absent Defendants' anticompetitive conduct and continuing anticompetitive agreements. Plaintiff and

Injunctive Class Members also face a continuing threat of injury from the unlawful conduct alleged in this Complaint.

161.    Plaintiff and Injunctive Class Members have purchased substantial amounts of glyburide indirectly from Defendants.

162.    Plaintiff and Injunctive Class Members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that Defendants' conduct violates Section 1 of the Sherman Act.

163.    Plaintiff and Injunctive Class Members also seek equitable and injunctive relief, including disgorgement of profits, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

## SECOND CLAIM FOR RELIEF

### State Antitrust Violations
### (By Plaintiff and Damages Class Members Against All Defendants)

164.    Plaintiff incorporates the preceding paragraphs by reference.

165.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme to fix, raise, maintain, and stabilize the prices of glyburide and allocate markets and customers for glyburide.

166.    Defendants' unlawful conduct harmed Plaintiff and Damages Class Members in the manner explained above.

167.    Defendants' unlawful conduct covered a sufficiently substantial percentage of the relevant market to harm competition.

168.    Defendants' actions constitute horizontal market allocation and price-fixing agreements between actual and potential competitors and are illegal *per se* under state antitrust laws.

169.    Defendants' supracompetitive pricing constitute a continuing violation of the laws of the states listed below in that each purchase by Plaintiff or a member of the Damages Class of supracompetitively priced glyburide caused injury to their business or property.

170.    Defendants' conduct violated the following state laws:

(a)    Ala. Code § 6-5-60, with respect to purchases in Alabama by members of the Damages Class;

(b)    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by members of the Damages Class;

(c)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Damages Class;

(d)    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by members of the Damages Class;

(e)    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Damages Class;

(f)    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by members of the Damages Class;

(g)    Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa by members of the Damages Class;

(h)    Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Damages Class;

(i)     Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Damages Class;

(j)     Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Damages Class;

(k)     Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Damages Class;

(l)     Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Damages Class;

(m)     Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class;

(n)     Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Damages Class;

(o)     Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by members of the Damages Class;

(p)     N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Damages Class;

(q)     N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by members of the Damages Class;

(r)     N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by members of the Damages Class;

(s)     N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by members of the Damages Class;

(t)     Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by members of the Damages Class;

(u)     R.I. Gen. Laws §§ 6-36-1 *et seq.*, with respect to purchases in Rhode Island by members of the Damages Class;

(v)     S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by members of the Damages Class;

(w)     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Damages Class;

(x)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by members of the Damages Class;

(y)     Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Damages Class;

(z)     W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Damages Class; and

(aa)    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Damages Class.

171.    Plaintiff and Damages Class Members have been and continue to be injured in their business or property by Defendants' antitrust violations. Their injuries consist of: (1) being denied free and open competition between competitors in the market for glyburide; and (2) paying higher prices for glyburide than they would have paid in the absence of Defendants' wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

172.    Plaintiff and Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

173.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and Damages Class Members.

174.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the above-listed state antitrust laws.

### THIRD CLAIM FOR RELIEF

**Unjust Enrichment**
**(By Plaintiff and Damages Class Members Against All Defendants)**

175.    Plaintiff incorporates the preceding paragraphs by reference.

176.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

177.    Defendants have benefited and continue to benefit from the overcharges on sales of glyburide made possible by the unlawful and inequitable acts alleged in this Complaint.

178.    Defendants' financial benefits are traceable to Plaintiff's and Damages Class Members' overpayments for glyburide.

179.    Plaintiff and Damages Class Members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and Damages Class Members.

180.    It would be futile for Plaintiff and Damages Class Members to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to anyone for any of the benefits they received indirectly from Plaintiff and Damages Class Members.

181.    It would be futile for Plaintiff and Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased glyburide, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class Members for Defendants' unlawful conduct.

182.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for glyburide is a direct and proximate result of Defendants' unlawful practices.

183.    The financial benefits Defendants derived rightfully belong to Plaintiff and Damages Class Members, who paid, and continue to pay, anticompetitive prices that inured to Defendants' benefit.

184.    It would be inequitable under unjust enrichment principles under the laws of each of the states in the United States and the District of Columbia for Defendants to retain any of the overcharges Plaintiff and Damages Class Members paid for glyburide that were derived from Defendants' unfair and unconscionable methods, acts, and trade practices.

185.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.

186.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class Members.

187.    A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received that are traceable to Plaintiff and Damages Class Members.

188.    Plaintiff and Damages Class Members have no adequate remedy at law.

## **DEMAND FOR JUDGMENT**

Accordingly, Plaintiff, on its own behalf and on behalf of the proposed Classes, demands judgment that:

A.    Determines that this case may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice of this case be given to members of the Classes under Rule 23(c)(2), and declares that Plaintiff is a proper representative of the Classes;

B.    Declares that Defendants' conduct violated Section 1 of the Sherman Act, the other state statutes set forth above, and the common law of unjust enrichment;

C.    Enjoins Defendants from continuing their illegal activities;

D.    Enters judgment against Defendants joint and severally and in favor of Plaintiff and the Classes;

E.    Grants Plaintiff and the Injunctive Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

F.    Awards the Plaintiff and the Damages Class damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

G.    Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

H.    Grants further relief as necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court deems just.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed classes, demands a trial by jury on all issues so triable.

Dated: January 19, 2017

**FINE, KAPLAN AND BLACK, R.P.C.**

ROBERTA D. LIEBENBERG
PAUL COSTA
ADAM J. PESSIN
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

**LABATON SUCHAROW LLP**
GREGORY S. ASCIOLLA
JAY L. HIMES
KARIN E. GARVEY
LARA GOLDSTONE
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
RUDI JULIUS
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
kgarvey@labaton.com
lgoldstone@labaton.com
mperez@labaton.com
rjulius@labaton.com

*Counsel for International Union of Operating
Engineers, Locals 302 and 612 Construction
Industry Health and Security Fund and the
Proposed Classes*